# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
## CASE NO.

DOMINICK ANTHONY DENNIS

     Plaintiff,

v.

OPTIMUM DEALERSHIP GROUP, LLC

And

OPTIMUM RV FL NORTH, LLC

_____Defendants._____/

## COMPLAINT

Plaintiff, DOMINICK ANTHONY DENNIS ("Plaintiff"), by and through his undersigned attorney, sues Defendants, OPTIMUM DEALERSHIP GROUP, LLC and OPTIMUM RV FL NORTH, LLC (both hereinafter combined into "Optimum" as the entities did not appear to act separately), and alleges as follows:

## INTRODUCTION

1.    This is an action for damages, declaratory, and injunctive relief by Plaintiff against Optimum for national origin discrimination under Title VII of the

Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, and the

Florida Civil Rights Act of 1992 ("FCRA"), and 42 U.S.C. §1981 ("§1981") as

well as for retaliation under Florida's Private Whistleblower Act, Florida Statute

§§448.101.104 ("FPWA"). This action also involves this Honorable Court's

supplemental jurisdiction to cover the intentional civil theft of Plaintiff's funds, as

well as breach of contract, both written and verbal, and unjust enrichment.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over this action pursuant to 28 U.S.C.

§1331,  42 U.S.C. §1981 and Title VII. The Court's supplemental jurisdiction is

invoked for the Plaintiff's state law claims pursuant to 28 U.S.C. §1367.

3.      Venue properly lies in this judicial district pursuant to 28 U.S.C.

§1391(b), in that the Defendant maintains offices within this judicial district,

carries on commerce with citizens of this judicial district at open places of business

located within this judicial district and Plaintiff primarily worked for Best Roofing

within this judicial district.

## PARTIES AND EXHAUSTION OF REMEDIES

4.      Plaintiff is a male of Italian-American national origin, sui juris, and, at

all times material to this action, was a resident located in part of Marion County,

Florida and for the majority of the time listed in the complaint he worked for

Optimum out of its Marion County premises.  Plaintiff primarily worked as a

Salesman for Optimum and was paid primarily through the receipt of Commissions for sales.

5.     Optimum are two separately registered American corporations that appear to operate as one entity and that has maintained an office in Marion County Florida and both share a registered agent listed as Corporate Creations Network Inc. at 801 US Highway 1, North Palm Beach FL 33408.  At all times material to the complaint, Optimum maintained commercial operations within the state of Florida through the Marion County location, as well as other offices located throughout the state.  Optimum was principally engaged in the retail sales of new and used Recreational Vehicles ("RVs").  The majority of the retaliation and discrimination that Plaintiff faced occurred while he was located in Marion County.

6.     Plaintiff has complied with all conditions precedent to jurisdiction under Title VII and the FCRA in that he filed his Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Florida Commission on Human Relations ("FCHR") within 300 days of the unfair employment practices alleged in this Complaint; Plaintiff has filed this suit within 90 days of receiving a Right to Sue notice from the EEOC dated July 17, 2023 that was received by Plaintiff on July 24, 2023; and Plaintiff is filing this Complaint within the FCRA's four (4) year statute of limitations for the

alleged discriminatory acts. Thus, all administrative prerequisites have been satisfied and this suit is timely filed.

## GENERAL ALLEGATIONS

7.      Plaintiff started his employment with Optimum in their Marion County offices at some point in December 2020 as a Salesman of new and used RVs.

8.      During an interaction with a customer on Feb 26th, 2021, Plaintiff was vehemently and angrily that I was yelled at by Assistant Finance Director Connor Cockfield (who also served as Plaintiff's direct supervisor)(hereinafter "Supervisor Connor") because Plaintiff refused an express directive from him to deceive a customer by lying about the original sales price.  Supervisor Connor became physically angry and would slam his fist on the desk, scream and use profanity including derogatory terms for Italian-American's directed at Plaintiff if he was either frustrated or upset about any interactions with the customers.  At all times during Plaintiff's employment when Supervisor Connor became angry at Plaintiff he would refer to him as "Wop", "Italian Midget", and "The Dirty Italian". This would become ongoing and continued throughout Plaintiff's employment everytime Supervisor Connor became upset.  On one interaction, Supervisor Connor started screaming and then began punching his keyboard repeatedly so hard that the letters and numbers started flying everywhere, some of

them hitting Plaintiff directly in the process.  These constant derogatory remarks and rages triggered health related side effects such as substantially increased blood pressure to the point Plaintiff was being physically impacted.

9.    When Plaintiff complained to Optimum's Finance Director Cale Rogers (who was over all financial deals for Optimum and Supervisor Connor's direct manager)(hereinafter "Finance Director Cale") about Supervisor Connor's hostile and discriminatory outbursts directed at Plaintiff's national origin he was just turned away.  When these issues were first brought to his attention by Plaintiff, Finance Director Cale just laughed and said "Well he is still young and learning and growing into his management role, just ignore him". Later, following a similar hostile and discriminatory incident on August 23, 2022, Finance Director Cale told Plaintiff to forget the profanities and Italian-American racial slurs and said "he is still learning his boundaries, just ignore him."

10.    As a Salesman, Plaintiff would earn money from Optimum by receiving a percentage of his overall sales of Optimum RVs minus a "Chargeback" that were supposedly based on standard practices of any warranty cancellations as well as any finance reserve that the banks charged back if a consumer paid their unit off, traded it in or refinanced with another bank.  Chargebacks happen in the 15th and 20th of every month and would be applied before any commission was received.  The Chargebacks would be "washed out" of the commissions before

payment was received the following Thursday before the end of the month (18th

through the 30th depending on month).

     11.    Plaintiff's Original Commission plan was the following:

1.75% base percentage on total gross after standard chargebacks each
month.
.25% increase at 850K in gross sales
.25% increase at 1 million in gross sales
.25% increase at 1.15 million in gross sales

     12.    The Chargebacks applied to Plaintiff's commissions prior to March

2021 were $189,000.00 or under.  Plaintiff's Chargeback for March 2021 was

$390,850.  Plaintiff complained immediately to Finance Director Cale who told

Plaintiff he would check on the substantially increased Chargebacks get back to

him.  The Chargebacks continued to be several hundred thousand dollars over

those in the beginning of his career with Optimum.  Plaintiff, continued to bring up

the issue with Finance Director Cale Rogers and Optimum's Comptroller Leah

Nelson ("hereinafter Comptroller Leah") and they would provide only evasive

answers or no answers.

     13.    Starting at some point in November 2021, it became common practice

for him to be approached by Optimum's Finance Director Cale and Supervisor

Connor and they would demand that he submit falsified and/or otherwise

fraudulent deal information to banks and credit unions.

14.     This fraudulent deal information demanded by Finance Director Cale and Supervisor Connor took many forms.  The most common form would be to pull information on the RV coaches from the online National Automobile Dealers Association ("NADA") price guide and rather than use the actual year, make, model and "trim"/accessories of the RV they would fabricate an imaginary higher end make, model and trim which resulted in a higher estimated value of the RV. They would then use this inflated estimated value to fraudulently induce banks and credit unions to extend credit amounts past the actual value of the RV so that customers would be approved for a highly inflated sales price.  As a hypothetical example, an RV worth $150,000.00 according to the NADA would typically only be approved for at most that amount by the credit unions and banks.  However, by falsifying information and fraudulently creating an RV with a new estimated value of $250,000, then Optimum could sell the RVs to a customer for up to $250,000 and the customer would be none the wiser that he or she had been "ripped off" by $100,000.00 on the sales.  And the bank or credit union would only find out that they had been fraudulently induced to extend credit for an RV worth only a fraction of what they had extended when the customer was unable to afford the hyperinflated monthly loan payment plan.

15.     Another common way that Optimum directed its Salesman to fraudulently submit deals was to have Supervisor Connor or Finance Director Cale

utilize the Adobe Pro Account run by Finance Director Cale to delete correct

information and then fraudulently falsify new higher totals on customer's IRS tax

forms, pay stubs, utility bills, credit score and other financial ability forms.  These

newly and fraudulently inflated IRS tax forms, pay stubs, credit score and other

financial ability forms would then be used to fraudulently induce banks and credit

unions to extend more credit to a customer than they would typically offer.  A

frequent tactic by Optimum's higher management was to take the customer's social

security award letters and use Adobe Pro to alter them to make it look like the

customers were making two or three times the actual awarded amounts.

Frequently, these forms of fraudulent deals were utilized in combination with the

fraudulent NADA information to convince banks and credit unions to extend

substantially more credit than the RV was worth to customers who the banks and

credit unions would not typically believe that they could actually afford to make

those hyperinflated payments.

16.    A third common fraudulent alteration by Optimum was to alter the

customers utility bills using Adobe Pro tool to create falsified home addresses.

Most instances of these actions occurred when customers were living in RV/Motor

home parks which would invalidate their applications due to common lender's

guidelines against providing loans to individuals in these poorer and riskier areas.

17.    A fourth common fraudulent alteration required at Optimum of Salesmen were to "White out the customer disclosure" which was on each printed menu listing the customers protection options. This disclosure statement provided the customers' base payment and interest rate that was used for the payments listed. It is standard practice to disclose this information in the car business where Plaintiff had worked prior and Plaintiff refrained from "hiding" this information as he was taught it was legally required in the auto industry.  Plaintiff was reprimanded by Supervisor Connor and Finance Director Cale whenever Plaintiff failed to white out the customer menu. When Plaintiff first started in this position, Plaintiff was told flatly by Finance Director Cale "We do not want the customers to know their base payment or interest rate."

18.    On several occasions Plaintiff witnessed conversations via email with a finance manager in Titusville (Matt Raby) performing paycheck stub alterations when the customers did not make adequate income to afford the coaches. Plaintiff specifically asked Matt Raby why they would do that and risk so much, and Plaintiff was told "How do you think we are able to put so much damn money on the books each month?"

19.    At all times, Plaintiff refused to knowingly submit the fraudulent deals to credit unions and banks even though he was instructed to do so on a more than daily basis by his direct Supervisor Connor and the supervisor of his direct

report, Finance Director Cale.  Typically, when confronted with the refusal to

commit illegal acts by Plaintiff, Finance Director Cale and Supervisor Connor

would simply "laugh it off" and Plaintiff would be repeatedly instructed that

"EVERY Salesman has to 'Powerbook' deals sometimes and you will learn or get

fired."   Plaintiff was also told by Finance Director Cale that "If I wanted to stay in

the department, this was going to be the new standard" and that  "I was expected

keep my head down and to play the game."  As Plaintiff was undergoing a child

custody battle with his ex-wife at the time and salary was an important component,

Plaintiff did "keep his head down" other than refuse to participate and to complain

directly to Optimum's management in the form of Finance Director Cale and

Supervisor Connor.

20.    On December 10, 2021, Plaintiff was retaliated against for his refusal

to submit fraudulent deals when his commission plan was downgraded and

changed to be retroactively applied to December 1, 2021 forward to "$10k a month

plus potentially an extra $2,500 if it reached $12,500 @ a 1.25% commission."

This change substantially negatively impacted Plaintiff's overall pay as for one it

capped his ability to earn to only $12,500.00 a month and he had nearly always

earned more than that under the previous commission plan.

21.    Plaintiff immediately confronted Finance Director Cale  on Dec 10,

2021 about the retaliatory commission rate.  Finance Director Cale stated "You

have to be willing to play the game.  I'm willing to try to get back.  But you have to step up and show that you are willing to be on the team."  Plaintiff joked "I don't look good in federal prison blues" and walked away.  Despite the substantial negative change to his pay, Plaintiff could not quit that close to the Christmas Holidays with a new daughter born January 24, 2021 and a second daughter on the way to by born on February 2, 2023.

22.    Plaintiff had been repeatedly complaining about the fictitious and fraudulent Chargebacks that had been applied since March 2021, but it wasn't until December 2021 that he received an answer.  Comptroller Leah eventually had a candid conversation with him on December 21, 2021.  At that meeting Comptroller Leah told him that "She was expressly authorized to penalize us up to an additional $200,000 a month because Cale didn't get along with me, and Denver (Beck, the primary owner of Optimum) and Johnnie (Hernandez, the General Manager over all of Optimum) said to penalize him (Cale) and the whole (sales and finance) department because it meant more money for the owners." Plaintiff asked Comptroller Leah why it was fair to ordinary salespeople like himself and she said "It's not, but Denver and Johnnie said to charge them anyways."  Plaintiff was shocked by the information and did not know how to respond so he just shifted the conversation to other elements of office politics.

23.    Plaintiff confronted Finance Director Cale the following day (December 22, 2021) with the information Comptroller Leah had provided him and Finance Director Cale said "That makes sense.  Don't worry I'll get to the bottom of it and make it right."   Following this conversation, Plaintiff would bring it up to Finance Director Cale every two weeks or more, demanding to know when an audit of the chargebacks would occur and Finance Director Cale just continued to brush it off and ignore it.

24.    Plaintiff continued to make a high number of sales and "kept his head low" despite refusing to do fraudulent deals, but he repeatedly brought up the pay decrease to General Manager Johnnie Hernandez, Finance Director Cale, Supervisor Connor and Comptroller Leah repeatedly eventually it was addressed on March 31, 2022, when Plaintiff's commission was changed to

1% < $1.25 million net finance income
1.25% - 1.25 million – 1.5 million
1.5% > $1.5 mil net finance income

This new pay commission rate was better than the first retaliatory commission change but still substantially below his initial commission pay schedule.

25.    At some point around March 2022, and perhaps encouraged by Supervisor Connor's continued use of derogatory language mocking Italian-Americans being used against Plaintiff, the General Manager of Optimum Johnnie Hernandez started to use offensive Italian-American language to direct his anger at

Plaintiff.  On several occasions, Plaintiff would get on his knees on the sale and

started talking in a high-pitched voice saying "Hi, I'm Dominick, the Italian

Stallion, I'm following the yellow brick road" and "Hey, I'm Diamond Dom, The

Italian Stallion, How can I help you today?" When Plaintiff brought these

interactions with General Manager Johnnie Hernandez up with Finance Director

Cale, Plaintiff was just told "Stop being sensitive and a crybaby."

26.    Plaintiff continued to complain about the fictitious Chargebacks, his

reduced payment plan and the discriminatory behavior directed at Italian-

American's such as himself.  Eventually, on September 13, 2022, Plaintiff was

called into General Manager Johnnie Hernandez's office and confronted by

Finance Director Cale and General Manager Johnnie Hernandez in reference to my

request to obtain the chargeback reports for the prior two years.  Both of

Optimum's upper management team laughed and Plaintiff was told by General

Manager Johnnie Hernandez "I'm not interested" (in providing that information)

and "Maybe you should ask for a raise once we get back from the Tampa RV

show".

27.    Subsequent to that meeting, Plaintiff sent an email to Finance Director

Cale which stated:

> "Good day,
> We had a meeting at around 1:30pm on 9/13 and you specifically refused to provide the
> chargeback breakdowns I had requested earlier that day from Leah and Marni stating "I'm not
> interested". I had requested for them to provide any details as to how much money you were

taking from my wages and commissions each month. I requested this so I could know and plan my bills accordingly, as I stated in the meeting between you, myself and Cale.  The charge backs do not seem fair based on my prior conversation with Leah regarding the 100,000.00-150,000.00-fee because she does not like Cale.  She clearly stated the evening 12/21 that yourself and Denver were good with the idea of taking unwarranted additional money from sales as you would be able to save on what you pay us for over the last year. You stated in our meeting that "Leah is busy and was under a lot of pressure at the time of our conversation" and then Cale stated, "Connor and I have come to accept the chargebacks and just move on", and I stated I just wanted to understand how our pay is constantly adjusted to what seems to prevent us from hitting our percentage goals.

Since mid-December my family has been in a financial downward spiral (to which you stated, "Not my problem, I don't control your bills" when we discussed this in the meeting on 9/13), I have voiced my concerns monthly to Cale about my pay plan being drastically changed due to me not submitting fraudulent and unethical deals and feeling uncomfortable with certain unethical processes being done daily.  Nor do I understand nor agree with the fictitious Chargebacks being used to reduce our pay percentage in order to avoid paying us the percentage we are due. The agreement when I was offered the position in finance were that the chargebacks are standard as every other dealership in Ocala. The chargebacks consist of warranty cancellations should the customer cancel or trade their coach, bank reserve chargeback once a customer either pays off or trades in the coach.

There were discussions of fees as well when I was offered the position, but those fees were clearly discussed as only being miscalculation of taxes or tag fees that we collect from the customer being incorrect, we would be charged with the error amount still due. There was also a 500.00 fee for not having a customer service contract and payment options menu in every deal (which I do not believe we are legally compliant with as some get white out used on the customers numbers as well as the customers full disclosure is removed from most of the ones I presented). There has never been a discussion of "Administration Fees" as Cale and you are now bringing to light as questions are being asked by all of us as the chargebacks have now entered into the 400,000.00 a month range. The average dealership our volume has historically averaged 150,000.00-200,000.00 in chargebacks max each month, which I have personally reached out to several local stores to confirm.

With all of this being said, the daily interactions with Connor have become hostile as he has verbally attacked me on several occasions. One of the more recent, he requested that I ask a customer about what they would like to pay a month, when I stated I had and that they gave me a range, he proceeded to get irate and he started punching his keyboard to which he broke into several pieces some of them hitting me.  He lashed out at me and made threatening statements as well. Fast forward a couple weeks and he called me lashing out at me again as I was at my local voting precinct voting before the only precinct, I was able to vote at closed. I did mention to him as well as yourself that we had slowed down and this was my only opportunity to go vote. He stated that I would lose my only day off for taking the 30 minutes away from the dealership to do my civic duty. When I responded with, he is not allowed to do that he stated that "I will see". I notified Cale of both interactions, as well as the many regular moments where Connor lashed out

at me and Cale responded with "He is just young and growing up still, don't worry about it" and I responded with he is not allowed to treat people that work under him this way.

So based on my calculations of the last 20 months monthly commission washouts, which I only have ten of, and I was ignored by Cale on the several requests to obtain the 10-month close washouts we never received, I have used the low end of 150,000.00 in fictitious chargebacks per month against my pay percentage equaling $200,329.54 in owed earned income to myself from Optimum RV that was wrongfully and illegally taken from my pay. I used the average of the ten months divided by the amount to come up with the total amount multiplied. I suspect I am on the extreme low end of the fictitious chargeback amounts since we hit well over 400K in supposed chargebacks on several months, which were never validated when requested by me on a monthly basis. I feel that yourself and whomever is responsible for calculating our pay deductions have falsely and illegally adjusted our pay calculations in order to prevent having to pay us the commissions due. Based on the common unethical practices done day to day at Optimum RV I do not feel comfortable with what I have been told and shown as well as paid.

You have done nothing to counter my belief that you are in violation of Florida's wage and commission laws and any contract between us.  If this is not received by me at this email address in two weeks, I will request it through legal discovery after filing suit for my missing wages.

Dominick Dennis
352-874-7874 Cell"

28.    Subsequent to the receipt of this e-mail, nothing was done by Optimum to address any of Plaintiff's concerns.  Plaintiff obtained counsel and a demand letter was sent on October 7, 2023 via e-mail and US Mail to Denver Beck and other owners and upper management of Optimum detailing the funds stolen by Optimum from Plaintiff as well as notifying them that consistent with Florida Statute §448.102 Florida Statutes that they would notify appropriate state and federal agencies as well as bring legal suit if the attempts to make Plaintiff commit unlawful fraudulent activities continued and the civil theft of his money continued.

29.    Rather than investigate Plaintiff's complaints of illegal fraudulent activity and civil theft of his earned commissions, Plaintiff was immediately terminated in retaliation for his protected whistleblowing activity on October 10, 2023 and he was threatened in writing by Optimum's retained counsel that they would push for criminal prosecution for extortion if he continued.

30.    Plaintiff has satisfied all conditions precedent to bringing this action or these conditions have been waived or otherwise excused.

31.    Plaintiff has retained the undersigned attorney to represent him in this action and is obligated to pay said attorney a reasonable fee for his services. Plaintiff requests said attorneys' fees as damages in this lawsuit.

## COUNT I: VIOLATION OF FCRA (NATIONAL ORIGIN DISCRIMINATION)

32.    This is an action for discrimination based upon national origin under the FCRA.

33.    Plaintiff reasserts the general allegations as set forth above in paragraphs 1-31 and incorporates these allegations herein by this reference.

34.    Defendant violated the FCRA by discriminating against Plaintiff based upon his national origin by repeatedly subjecting him to profane tirades and discriminatory language against Plaintiff including referring to him as a "Wop", "Dirty Italian", "Midget Italian", "Diamond Dom", "The Italian Stallion" and other

such examples of discrimination further detailed in paragraphs 1-33.  These

constant derogatory remarks triggered health related side effects such as

substantially increased blood pressure to the point Plaintiff was being physically

impacted.

35. As a result of Defendants' violations of the FCRA, Plaintiff has been

damaged.

WHEREFORE, Plaintiff, DOMINICK ANTHONY DENNIS, prays that this

Court will:

a. Order Defendants, OPTIMUM DEALERSHIP GROUP, LLC and

OPTIMUM RV FL NORTH, LLC, to remedy the national origin

discrimination of Plaintiff by:

i. Paying appropriate back pay;

ii. Paying prejudgment and post-judgment interest;

iii. Paying front pay in lieu of reinstatement;

iv. Paying for lost benefits including medical insurance, pension and

retirement plan;

v. Providing any other relief that is appropriate.

b. Enter an order against Defendants for compensatory damages;

c. Enter an order against Defendants for punitive damages;

d. Grant Plaintiff costs and a reasonable award of attorney's fees pursuant to

Section 760.11(5), Florida Statutes.

## COUNT II: VIOLATION OF TITLE VII (RACE AND SEX DISCRIMINATION)

36.    This is an action for discrimination based upon race and sex under

Title VII.

37.    Plaintiff reasserts the general allegations as set forth above in

paragraphs 1-31 and incorporates these allegations herein by this reference.

38.    Defendant violated Title VII by discriminating against Plaintiff based

upon his national origin by repeatedly subjecting him to profane tirades and

discriminatory language against Plaintiff including referring to him as a "Wop",

"Dirty Italian", "Midget Italian", "Diamond Dom", "The Italian Stallion" and other

such examples of discrimination further detailed in paragraphs 1-33.   These

constant derogatory remarks triggered health related side effects such as

substantially increased blood pressure to the point Plaintiff was being physically

impacted.

39.    Defendants' discriminatory actions had the purpose and effect of

denying the Plaintiff rights in connection with his employment with Optimum that

employees outside his national origin were allowed to enjoy.

40.    As a result of Defendants' violations of Title VII, Plaintiff has been damaged.

WHEREFORE, Plaintiff, DOMINICK ANTHONY DENNIS, prays that this Court will:

a. Order Defendants, OPTIMUM DEALERSHIP GROUP, LLC and

OPTIMUM RV FL NORTH, LLC, to remedy the national origin

discrimination of Plaintiff by:

      i. Paying appropriate back pay;

      ii. Paying prejudgment and post-judgment interest;

      iii. Paying front pay in lieu of reinstatement;

      iv. Paying for lost benefits including medical insurance, pension and

      retirement plan;

      v. Providing any other relief that is appropriate.

b. Enter an order against Defendants for compensatory damages;

c. Enter an order against Defendants for punitive damages;

d. Grant Plaintiff costs and a reasonable award of attorney's fees pursuant to

Section 760.11(5), Florida Statutes.

## COUNT III: VIOLATION OF FLORIDA'S PRIVATE WHISTLEBLOWER'S ACT

41.    Plaintiff reasserts the general allegations as set forth above in paragraphs 1-31 and incorporates these allegations herein by this reference.

42.    Florida Statute §448.102 (1) prohibits an employer from taking a retaliatory personnel action against an employee because the employee has "Disclosed, or threatened to disclose, to any appropriate governmental agency, under oath, in writing, an activity, policy, or practice of the employer that is in violation of a law, rule, or regulation."

43.    Florida Statute §448.102 (3) prohibits an employer from taking a retaliatory personnel action against an employee because the employee has "Objected to, or refused to participate in, any activity, policy, or practice of the employer which is in violation of a law, rule, or regulation."  Defendants continued to retaliate against Plaintiff when he repeatedly refused to submit fraudulent financial information to customers, credit unions and banks by sharply reducing his commission pay structure to the point it significantly negatively impacted how much Plaintiff was earning.

44.    Plaintiff's statutorily protected conduct under the FWPA was casually connected to Defendants decision to terminate Plaintiff.  Rather than investigate Plaintiff's claims that he was observing fraudulent activity and that upper management at Optimum was trying to force Plaintiff to submit the same fraudulent financial reports, as well as his objection to the continual civil theft of his earned commissions by Optimum owners, the owners of Optimum decided to immediately terminate Plaintiff and fraudulently accuse him of criminal extortion.

The decision to fire him after making the threat in writing that he would report the issues to appropriate federal and state agencies as well as submit a legal complaint is in stark violation of the FWPA.

45.    As a result of Defendants' violation of the FWPA, Plaintiff has been damaged.

WHEREFORE, Plaintiff, DOMINICK ANTHONY DENNIS, prays that this Court will:

a Order Defendants, OPTIMUM DEALERSHIP GROUP, LLC and OPTIMUM RV FL NORTH, LLC. to remedy the violation of the FWPA by:

i. Paying appropriate back pay;

ii. Paying prejudgment and post-judgment interest;

iii. Paying front pay in lieu of reinstatement;

iv. Paying for lost benefits including medical insurance, pension and retirement plan;

v. Providing any other relief that is appropriate.

b. Enter an order against Defendants for compensatory damages;

c. Enter an order against Defendants for punitive damages;

d. Grant Plaintiff costs and a reasonable award of attorney's fees pursuant to Section 448.104, Florida Statutes.

e. Enter an injunctive order against Defendants ordering that they

immediately rehire Plaintiff at his former position and pay rate.

## COUNT IV: CIVIL THEFT

46.    Plaintiff re-alleges the allegations contained in paragraphs 1-31 above.

47.    Plaintiff submitted a written notice to Optimum's ownership clearly

stating the civil theft that was occurring to Plaintiff's earned commissions by

Optimum.  This demand notice was submitted more than 30 days prior to the

commission of the trial.

48.    Defendants continue to abscond and hold Plaintiff's earned

commissions through the use of fictitious "Chargebacks" and these funds were

stolen for the benefit of the owners of Optimum.

49.    Plaintiff has been damaged due to Defendants willful failure to pay

Plaintiff for all of his services.  Defendants have willfully failed to pay Plaintiff for

worked previously performed, both by substantially reducing his commission rate

for failing to submit fraudulent financial information but also by creating fictitious

Chargebacks in the hundreds of thousands of dollars for the benefit of the owners

of Optimum.  Prior to the commission of Discovery, a reasonable estimate of this

loss is $500,000.00.

WHEREFORE, Plaintiff requests judgment against the Defendants for treble damages and prejudgment interest, together with costs of suit and reasonable attorney fees, and such other and further relief as the court may deem proper.

## COUNT V: BREACH OF WRITTEN EMPLOYMENT CONTRACT

50.     Plaintiff re-alleges the allegations contained in paragraphs 1-31 above.

51.     Plaintiff and Defendants entered into a written agreement as described for his work.

52.     Pursuant to the parties' agreement Defendants agreed to compensate the Plaintiff at the terms specified above.

53.     An essential term of the written agreement was that Defendants would pay Plaintiff according to the terms of said agreement.

54.     Defendants have willfully failed to pay Plaintiff for worked previously performed, both by substantially reducing his commission rate for failing to submit fraudulent financial information but also by creating fictitious Chargebacks in the hundreds of thousands of dollars for the benefit of the owners of Optimum.  Prior to the commission of Discovery, a reasonable estimate of this loss is $500,000.00.

55.    Plaintiff has been damaged due to Defendants willful failure to pay Plaintiff the appropriate agreed upon commissions.

56.    Pursuant to § 448.08, Florida Statutes, Plaintiff is entitled to costs of the action and a reasonable attorney's fee.

WHEREFORE, Plaintiff requests judgment against the Defendants for damages and prejudgment interest, together with costs of suit and reasonable attorney fees, and such other and further relief as the court may deem proper.

**COUNT VI: BREACH OF ORAL EMPLOYMENT CONTRACT**

57.    Plaintiff re-alleges the allegations contained in paragraphs 1-31 above. This count is alleged in the alternative to Counts V and VII.

58.    Plaintiff and Defendants entered into an oral agreement with the terms specified in the above allegations to pay Plaintiff for his work.

59.    Pursuant to the parties' agreement Defendants agreed to compensate the Plaintiff at the terms specified above.

60.    An essential term of the oral agreement was that Defendants would pay Plaintiff according to the terms of said agreement.

61.    Defendants have willfully failed to pay Plaintiff for worked previously performed, both by substantially reducing his commission rate for failing to submit fraudulent financial information but also by creating fictitious Chargebacks in the hundreds of thousands of dollars for the benefit of the owners

of Optimum.  Prior to the commission of Discovery, a reasonable estimate of this

loss is $500,000.00.

62.    Plaintiff has been damaged due to Defendants' willful failure to pay

Plaintiff the appropriate agreed upon commissions.

6641. Pursuant to § 448.08, Florida Statutes, Plaintiff is entitled to costs of

the action and a reasonable attorney's fee.

WHEREFORE, Plaintiff requests judgment against the Defendants for

damages and prejudgment interest, together with costs of suit and reasonable

attorney fees, and such other and further relief as the court may deem proper.

## COUNT VII – UNJUST ENRICHMENT

42.    Plaintiff re-alleges the allegations contained in paragraphs 1-31 above.

This count is alleged in the alternative to Counts VI and VII.

43.    As an alternative pleading to the allegations in Counts VI and VII,

Plaintiff gave Defendants benefits but was not compensated fully for his services.

44.    Defendant has accepted these services and never objected to the same.

45.    Plaintiff has been damaged due to Defendants willful failure to pay

Plaintiff for all of his services. Defendants have willfully failed to pay Plaintiff for

worked previously performed, both by substantially reducing his commission rate

for failing to submit fraudulent financial information but also by creating fictitious

Chargebacks in the hundreds of thousands of dollars for the benefit of the owners

of Optimum. Prior to the commission of Discovery, a reasonable estimate of this loss is $500,000.00.

WHEREFORE, Plaintiff, DOMINICK ANTHONY DENNIS, prays that this Court will:

a. Order Defendants, OPTIMUM DEALERSHIP GROUP, LLC and OPTIMUM RV FL NORTH, LLC, to remedy the unjust enrichment by:

    i. Paying appropriate back pay;

    ii. Paying prejudgment and post-judgment interest;

    iii. Paying front pay in lieu of reinstatement;

    iv. Paying for lost benefits including medical insurance, pension and retirement plan;

    v. Providing any other relief that is appropriate.

b. Enter an order against Defendants for compensatory damages;

c. Enter an order against Defendants for punitive damages;

d. Grant Plaintiff costs and a reasonable award of attorney's fees pursuant to Section 448.104, Florida Statutes.

## DEMAND FOR JURY TRIAL

Plaintiff, DOMINICK ANTHONY DENNIS, hereby demands trial by jury on all claims triable by right of jury under state or federal law.

Dated this 17th day of August, 2023

Respectfully submitted,

*Warren J. Pearson, JD*

Warren James Pearson, JD
3562 Four Oaks Blvd
Tallahassee FL 32311
Independent Co-Counsel with Marble Law
Counsel for Plaintiff
Telephone: (850) 567-6164
E-mail: warpear@gmail.com
Florida Bar No.: 0711578